

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

FTB:RWN
F. #2023R00696

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

May 9, 2026

By ECF

The Honorable Diane Gujarati
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:     United States v. Edna Ardales Franco
>          Criminal Docket No. 23-394 (DG)

Dear Judge Gujarati:

The government respectfully submits this sentencing memorandum in advance of the sentencing hearing for the defendant Edna Ardales Franco, which is scheduled for May 21, 2026. For the reasons set forth below, the government respectfully requests that the Court impose a sentence of 24 months' imprisonment. Such a sentence would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case.

I.        Offense Conduct

This case arises from the defendant's possession of counterfeit United States currency at John F. Kennedy International Airport ("JFK Airport") on September 19, 2023, and her subsequent failures to appear in court.

On September 19, 2023, the defendant and two men she was traveling with ("Individual-1" and "Individual-2") arrived at John F. Kennedy International Airport ("JFK Airport") on an international flight from Manila, the Philippines. See Presentence Investigation Report ("PSR") ¶ 14. During a secondary inspection of her luggage, Customs and Border Protection ("CBP") officers found $2,500 of counterfeit United States currency in $100 denominations, inside of a green envelope with the words "FAKE CURRENCIES SAMPLES." Id. ¶ 16. During this inspection, the defendant showed the CBP officers an identification card bearing her photograph and a badge with the text "4 Star General," "H-World U.N.", and "WPCDP Federation" and told them that that she had global immunity because she was affiliated with the United Nations. Id. ¶ 18. She also told them that she was bringing various checks in her possession to the United Nations.

Between the defendant's luggage that she was carrying and her luggage that was brought out of the airport by Individual-1, law enforcement agents found several documents and items showing her intent to print United States currency, along with several fake documents in which she claimed to possess authority from the Philippine government, the United Nations, and various other entities.  These included a document authorizing another person to print United States currency; an agreement to pay "cut/uncut United States dollars" from a warehouse in the Philippines to "beneficiaries" that was signed by the defendant; and a document authorizing another person to receive "cash pallets" that was also signed by the defendant.  See PSR ¶ 20.  She was also found to have a book containing images and descriptions of different denominations of Philippine currency, including the color of ink used and any watermarks.  Id. ¶ 17.

Text messages found on the defendant's cell phone showed that, for at least five months before her trip to the United States, she had discussed the printing, purchase, and sale of currency with others.  For example, in April 2023, a person saved in her phone as "sir knight meap 4thdegre" ("Co-Conspirator-1") messaged the defendant to tell her that Co-Conspirator-1 had an appointment to meet a buyer about "cut dollar"; the defendant responded later that day that "usd" was not for sale.[1]  See PSR ¶ 27.  Nevertheless, on May 3, 2023, the defendant told Co-Conspirator-1: "We can process the cut dollars."[2]

At one point in May 2023, Co-Conspirator-1 asked the defendant:

black dollar pls advise me what to do or could you pay the items
and bring to u.s ? or clean first? if my credential is not yet
available could you give me an authority or appointment as long as
it is a credible doc princess . i really need supporting paper to
move tnx

This communication indicates that Co-Conspirator-1 was expecting to receive some form of credential from the defendant to support the transportation of "black dollar[s]" to the United States.  The defendant responded: "Do the cut dollars first."

In June 2023, the defendant asked Co-Conspirator-1 if Co-Conspirator-1 was coming the next day for the currency.  The next day, Co-Conspirator 1 responded that other identified individuals could not bring the "cut dollar" that day.  A few days later, Co-Conspirator 1 texted the defendant that the "cut $$$ buyer" was in Makati (a city in the Philippines).

In July 2023, Individual-2 messaged the defendant about arranging for the inspection of "bunker/warehouse printing machine facilities[.]"  About two weeks later, another message from Individual-2 indicates that Individual-2 and the defendant were assessing currency

---

[1]    Many of these messages were in the Tagalog language.  Professional Tagalog-to-English translations were prepared in advance of trial.

[2]    United States currency is initially printed in sheets, which are then cut into individual notes for circulation.

printing equipment: "Roy's machine does not have cutter.  Previously, they said they needed ink but were not able to tell us how many different types[.]"

The contents of the defendant's cell phone suggest that she or her associates had access to large amounts of apparent United States currency.  These included several images showing United States hundred-dollar bills, some of which were bundled and packed into briefcases.  As an example, shown below is a still image from a 29-second video, sent by the defendant to Individual-1, depicting what appear to be stacks of United States hundred-dollar bills packed into crates:



The defendant profited from her claimed authority to print currency.  Text messages from the defendant's cell phone show that she repeatedly asked Individual-2 for money, including requesting $5,000 for someone who the defendant claimed "can print currency for us[.]"  Individual-2 told law enforcement agents that he had paid for the defendant's hotels, meals, and plane tickets with the understanding that the defendant was a princess of the Philippines and that he would receive a monetary reward once the defendant was able to cash one or more checks in her possession.  PSR ¶ 19.

On September 19, 2023, the defendant was charged by complaint with one count of importation of counterfeit currency and released on a $50,000 bond.  See ECF No. 1.  An

indictment was filed charging her with the same offense on September 29, 2023.  See ECF No. 9. On April 3, 2025, a trial date was set for July 28, 2025.  See ECF Dkt. Entry dated Apr. 3, 2025.

On July 1, 2025, the Court scheduled a pretrial status conference for July 8, 2025.[3]  The defendant was informed of this conference and did not appear.  The Court scheduled another pretrial status conference for July 9, 2025.  The defendant was informed of this conference and did not appear.  The Court then issued a warrant for the defendant's arrest.

On July 24, 2025—more than two weeks after her failures to appear—the defendant was arrested at an apartment in the Bronx, a residence that she had never reported to her pretrial services officer.  Historical cell site data showed that from July 7-14, 2025, her cell phone was consistently located in the vicinity of this Bronx apartment.  When the defendant was arrested, she repeatedly told the arresting officers that her name was "Edna Feanco," not "Edna Franco."  She presented a fake identification card with the false name "Edna Ardales Feanco" and claimed that she was not, in fact, the Edna Franco for whom the officers were looking.

The Court rescheduled the defendant's trial to December 1, 2025.  On that day, immediately before jury selection, the defendant pled guilty without a plea agreement to both counts of the indictment.  See ECF Dkt. Entry dated Dec. 1, 2025.

II.    The Defendant's History of Fraud

As the government outlined in its pretrial motions (see ECF Nos. 57, 59), the charged crime was not the defendant's first attempt to deceive others for her own gain.

A.  Mortgage Fraud

In 2012, when the defendant was residing in Hawaii, the Hawaii Office of Consumer Protection initiated a civil suit against the defendant, entitled State of Hawaii, by its Office of Consumer Protection v. Francha Services, LLC and Edna A. Franco, Civil No. 12-1-0247 (1).  The Office of Consumer Protection alleged that, since at least 2010, the defendant had represented to owners of distressed properties in Hawaii that she, through her wholly owned company, could save their homes from foreclosure.  After promising to provide forensic loan audits, free loan modifications, and to acquire title to the distressed properties "free and clear," the defendant collected money from homeowners for services that were either poorly rendered or never rendered at all.  Many Hawaii homeowners who paid money to the defendant subsequently lost their properties to foreclosure.  The Hawaii Office of Consumer Protection alleged that the defendant violated the Hawaii Mortgage Rescue Fraud Prevention Act by misrepresenting or concealing material facts, failing to identify the services she would perform, failing to use

---

[3]    Also on July 1, the defendant's pretrial services officer contacted her to confirm her current address.  The defendant responded: "I am moving to New York to face them all. Going to FBI and requests to return all my historical assets Chris. Kindly tell Michael [another pretrial services officer] I am going to get deployed to other countries and reporting it to the Court.  I AM A LAW ENFORCEMENT MYSELF[.]"

written contracts, failing to notify consumers in writing of their right to rescind their agreements, and receiving compensation before fully performing the promised services.[4]

On May 8, 2014, the Circuit Court of the Second Circuit of the State of Hawaii entered a final judgment and permanent injunction against the defendant, ordering the defendant to pay over $1 million in fines and restitution, enjoining her from operating any business in the state of Hawaii until the fines and restitution were paid, and enjoining her from acting as a distressed property consultant. See PSR ¶ 87.

B.   Attempt to Secure Release of Seized Assets in Money Laundering Investigation

On or about April 21, 2021, law enforcement agents executed federal search warrants at two residences in California and seized approximately $260,815 in United States currency and $228,597 in cryptocurrency. Id. ¶ 22. Following these seizures, one of the residents (the "Petitioner") filed a petition seeking the return of the seized assets. On September 9, 2021, a DEA agent received a phone call from the defendant, who claimed to speak on behalf of the Petitioner. The defendant told the agent that the seized assets belonged to her and that the Petitioner was working on her and her business partner's behalf. In an attempt to secure the assets' release, the defendant made false claims of authority similar to the ones she has made in this case, including that she was a founder under the United Nations charter and that she and her business partner had immunity from prosecution. About a week later, the Petitioner sent an email to a DEA mailbox claiming that they were a member of a non-government organization from the U.N. and had global immunity. Attached to this email were photographs of identification cards signed by "Edna A. Franco," "On Behalf of H.R.H. Tiburcio Villamor Marcos."

C.   Attempted Bank Fraud

On March 21, 2022, the defendant attempted to deposit a check in the amount of $9,000,000 into a bank account under her control in the name "Lakota Nation Holdings." See PSR ¶ 23. The check purported to be issued from a bank account associated with "HM Tiburcio Villamor Marcos." While this check was initially accepted for deposit, the bank did not permit the defendant to access any funds and promptly reversed the transaction and closed the account.

Similarly, on or about December 30, 2022, the defendant and Individual-1 attempted to deposit a fake check in the amount of $500,000,000 into the defendant's account at an investment company. Id. ¶ 25. The check purported to be issued by "Hipercapital Finance

---

[4]   When an investigator with the Hawaii Office of Consumer Protection served this complaint on the defendant, she screamed at the investigator and pushed him several times. See PSR ¶ 55. The defendant was arrested, convicted of harassment, and sentenced to 10 days' incarceration and an $800 fine. Id.

Offshore Bank Panama," and was made payable to the defendant.  The check was not accepted for deposit.

During the search of the defendant's luggage at JFK, law enforcement officers found the same fake $500,000,000 check that the defendant had previously attempted to deposit, and another fake check in the amount of $9,000,000, made payable to "Golden Renaissance" and purporting to be issued from a bank account associated with "HM Tiburcio Villamor Marcos," similar to the check she had attempted to deposit in March 2022.  Id. ¶¶ 24, 26.

D.  Printing of Checks While on Pretrial Release

While the defendant was on pretrial release for this case, from approximately September 2024 to January 2025, she rented a room at a hotel in Seminole, Oklahoma.  At the end of her stay, the defendant left several items behind in her hotel room, including an empty box for a VersaCheck check printer, blank check paper, and printed documents purporting to identify the defendant as an official with "H World Interpolcom."  Photographs of these items are attached hereto as Exhibit 1.

E.  Continued Mortgage Fraud

In approximately October 2025, while the defendant was on pretrial release for this case, a homeowner in Hawaii (the "Homeowner") reported to the Hawaii Officer of Consumer Protection that she had paid thousands of dollars to the defendant because the defendant had promised to help her fight foreclosure and retain her home.  The defendant provided the Homeowner with a check for approximately $1.6 million, signed by the defendant, with a memo line that began "MORTG. PYMT[.]"  Attached hereto as Exhibit 2 is an excerpt of text messages between the Homeowner and the defendant.  As shown in these messages, the Homeowner sent the defendant repeated payments, believing that the defendant could help with her eviction proceedings.  The defendant sent the Homeowner images of documents proclaiming her authority with H-World United Nations, and at one point sent a photograph of the same VersaCheck printer box that was later found in her Seminole, Oklahoma hotel room.

The defendant's offer of fraudulent mortgage relief services to the Homeowner was in direct violation of the terms of the permanent injunction in State of Hawaii, by its Office of Consumer Protection v. Francha Services, LLC and Edna A. Franco, Civil No. 12-1-0247 (1). After paying the defendant thousands of dollars, the Homeowner lost her home in foreclosure and was evicted.

III.  Applicable Law

A "district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted).  Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [it] may not presume that the Guidelines range is reasonable.  [It] must make an individualized assessment based on the facts presented."  Id. at 50 (citation and footnote omitted).  Section 3553(a) directs the court "in determining the particular sentence to impose" to

6

evaluate: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes of sentencing; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. "[I]n the ordinary case, the [U.S. Sentencing] Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." Kimbrough v. United States, 552 U.S. 85, 109 (2007) (internal quotation marks omitted); see also United States v. Rueda-Zarate, 291 F. App'x 364, 366 (2d Cir. 2008) ("A Guidelines sentence will in the ordinary case 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" (quoting Kimbrough, 552 U.S. at 109)); United States v. Fernandez, 443 F.3d 19, 27 (2d Cir. 2006) ("[I]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances."). "[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the Court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. Thus, the Court should first calculate the applicable Guidelines range and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

Any term of imprisonment imposed on Count Two (failure to appear) shall be consecutive to any term of imprisonment imposed on Count One (importation of counterfeit currency). See 18 U.S.C. § 3146(b)(2). Because the defendant committed the crime of failure to appear while on pretrial release, the defendant is also subject to an additional consecutive term of imprisonment of not more than ten years pursuant to 18 U.S.C. § 3147(1).

IV.   The Sentencing Guidelines

The United States Probation Department's ("Probation") calculation of the defendant's offense level in the PSR is as follows:

Count One: Importation and Possession of Counterfeit Currency

Base Offense Level (U.S.S.G. § 2B5.1(a))                                              9

Plus:   Part of the Offense Committed Outside the United States
        (U.S.S.G. § 2B5.1(b)(5))                                                      +2



| | | |
|---|---|---|
| Plus: | Obstruction of Justice[5] (U.S.S.G. § 3C1.1) | +2 |
| Adjusted Offense Level:[6] | | **13** |

**Count Two: Failure to Appear**

| | | |
|---|---|---|
| Base Offense Level (U.S.S.G. § 2J1.6(a)(2)) | | 6 |
| Plus: | Underlying Offense Punishable by Over 15 Years' Imprisonment (U.S.S.G. § 2J1.6(b)(2)(A)) | +9 |
| Plus: | Commission of Offense While on Release (U.S.S.G. § 3C1.3)) | +3 |
| Adjusted Offense Level: | | **18** |

**Grouping Analysis (U.S.S.G. §§ 3D1.1 through 3D1.5)**

| | | |
|---|---|---|
| Counts One and Two grouped per U.S.S.G. § 3D1.2(c) | | |
| Highest Adjusted Offense Level: | | 18 |
| Less: | Zero Point Offender (U.S.S.G. § 4C1.1)) | -2 |
| Total Adjusted Offense Level: | | **16** |

See PSR ¶¶ 35-53. The total offense level is 16, which, based on a criminal history category of I, carries an advisory Guidelines range of 21 to 27 months' incarceration. Id. ¶ 96.

In the plea penalty sheet submitted to the Court at the defendant's change-of-plea hearing, the government had included a two-level adjustment for acceptance of responsibility on the assumption that the defendant would fully and unconditionally accept responsibility for her crimes. See ECF No. 107 at 3. However, the defendant's statements since her guilty plea do not demonstrate a full acceptance of responsibility. As noted in the PSR, the defendant declined to discuss the offense with Probation, instead stating, "I never committed any crime." See PSR ¶ 32. Since her plea, the defendant has also submitted to the Court a document in which she

---

[5]     The government inadvertently omitted this enhancement from its plea penalty sheet. See ECF No. 107. The government agrees with Probation that it applies. Due to the operation of the Guidelines' grouping rules, its inclusion or omission does not affect the defendant's ultimate Guidelines range.

[6]     The PSR incorrectly states that the government's plea penalty sheet reflected a one-level enhancement for possessing more than $2,500 in counterfeit currency; it did not. See PSR ¶ 38 n.5. Cf. ECF No. 107 at 2-3.

requested a pardon and attached documents that she described as: an "affidavit from the National Bureau of Investigations (NBI) affirming my authority in connection with the matters described"; "documentation pertaining to monetary authority issued pursuant to Royal Order"; and documentation of her "immunity from prosecution." See ECF No. 113 at 2-3.

As noted by Probation, where an enhancement for obstruction of justice applies, the adjustment for acceptance of responsibility will only be appropriate in extraordinary cases. See PSR ¶ 33.  In light of the defendant's statements since her guilty plea, taken together with her failures to appear in Court, the government agrees with Probation that the adjustment for acceptance of responsibility is not appropriate.[7]

The government also contests the defendant's claim that her guilty plea "conserve[d] substantial judicial and prosecutorial resources." Def. Sent. Mem. at 5.  While the government and the Court were spared a two- to three-day jury trial, the defendant's guilty plea immediately before jury selection was scheduled to begin did not spare the government the substantial resources that it expended in preparing for trial, which included paying for Tagalog-to-English translations of her text messages and arranging travel for out-of-state witnesses.[8]

Therefore, the government agrees with Probation that the adjustment for acceptance of responsibility is inappropriate for this defendant, and Probation's Guidelines calculation is correct.

V.      A Total Sentence of 24 Months' Incarceration is Appropriate

The government respectfully requests that the Court impose a Guidelines sentence of 24 months' imprisonment, as this sentence is sufficient, but not greater than necessary to achieve the goals of sentencing.

The charged crimes are deserving of an incarceratory sentence.  The possession and transportation of counterfeit currency undermines the integrity of the dollar and sows mistrust in the financial system.  The evidence shows that the defendant not only imported counterfeit currency, she also agreed with others to print United States currency in the Philippines.  The printing and sale of counterfeit United States currency is especially harmful in other countries, where the average person is less familiar with genuine U.S. currency and more likely to be deceived into accepting fake bills as payment.  An incarceratory sentence within the

---

[7]      Based on the plea penalty sheet that the government prepared for the defendant's plea hearing, the defendant claims that the government has taken the position that the defendant accepted responsibility and should receive the adjustment in § 3E1.1.  Def. Sent. Mem. at 4.  But the government's expectation that the defendant would fully accept responsibility does not amount to a commitment to advocate for this sentencing reduction despite her later statements denying responsibility.

[8]      In fact, at the time of the defendant's sentencing, one witness was on a flight to New York to testify at her trial, and another witness was at the airport waiting to board.

Guidelines range is necessary to deter the defendant and others from engaging in similar counterfeiting operations.

The defendant's claims to have the authority of various governmental and non-governmental entities is likewise in need of deterrence. While her titles may seem fanciful, she has used them to convince others like Individual-2 and the Homeowner to send her money based on her claimed authority. As described above, over the course of more than a decade, the defendant has repeatedly tried to use her purported authority for her personal financial gain, including by cashing fake checks and attempting to secure the release of seized assets. People like the defendant who would impersonate government officials can and do cause real harm. In 2025, victims lost nearly $800 million to government-impersonation scams. See 2025 Internet Crime Report, Federal Bureau of Investigation, https://www.ic3.gov/AnnualReport/Reports/2025_IC3Report.pdf.

In addition, the defendant's deliberate failures to appear before this Court to face her pending criminal charges warrant the consecutive sentence that is required by statute. The defendant argues that she only absconded for a mere two weeks. Def. Sent. Mem. at 5. But this was not due to any decision by the defendant to surrender and end her time as a fugitive. Rather, she was apprehended at her apartment only after the government diverted its resources from preparing for her trial to locating her, including by obtaining a search warrant for location data.

The defendant argues that her failure to appear was "not the product of a calculated decision to evade justice," Def. Sent. Mem. at 5, but this argument is belied by the defendant's actions while she was at large. Defense counsel advised her of both scheduled court appearances by text message, and she did not respond to him. At least from June 7 to June 14, she was at an apartment in the Bronx, just over an hour from the courthouse by public transit, such that she easily could have attended either one of her court appearances. And when federal agents came to arrest her, she tried to deceive them with an identification card showing a false spelling of her name, claiming that she was not, in fact, the Edna Franco that the agents were looking for. While the defendant argues that many of her false statements are the result of delusional beliefs, she cannot claim that she legitimately believed that she was not Edna Franco. This was a deliberate lie in an attempt to avoid being arrested and returned to this Court.

Lastly, the defendant's request for leniency based on an unsupported narrative about "horrid" conditions at the MDC should be rejected. Def. Sent. Mem. at 17. Her descriptions of the MDC are inconsistent with the clear progress the facility has made in increasing and stabilizing staffing levels, improving medical services, reducing contraband smuggling, minimizing violence, and addressing other identified issues. See, e.g., United States v. Burgos, 24 Cr. 650 (LTS) (S.D.N.Y. May 21, 2025) (Tr. of Sentencing Hr'g 44: "[T]he conditions at the MDC detention facility have improved, including because staffing there has been increased."). While the defendant claims that violence at the MDC has increased over the last 18 months, a recent opinion by Judge Furman, who previously authored an opinion critical of the conditions at the MDC in United States v. Chavez, 710 F. Supp. 3d 227, 233 (S.D.N.Y. 2024), acknowledged precisely the opposite:

> [T]he place has still much need for improvement, but it is also a lot
> better than it was in January of last year when I wrote my opinion

10

> in United States v. Chavez that is cited in the defense's submission. As it happens, I just came from a meeting involving representatives of the MDC and got latest statistics, which is that staffing is up to 75 percent, the medical services staff is significantly higher and fully staffed among nurses, the incidents of violence went from 42 in December, which was a rather significant number, to only nine in April; all of which is to say it's not nearly as bad as it was a year and a half ago and it's definitely trending in the right direction.

United States v. Reshard, No. 24-CR-392 (JMF) (S.D.N.Y. May 14, 2025) (Tr. of Sentencing Hr'g 24:11-24).

Against this backdrop of institutional improvement, the defendant now—for the first time in her sentencing submission—makes claims of maggot-infested beans,[9] spoiled food, and partially cooked chicken. Def. Sent. Mem. at 17. The defendant does not claim that she herself has been served any expired or spoiled food, instead making a vague reference to what "detainees at MDC at times have been served." Id. Not one of these complaints was raised with the government or the Court prior to her sentencing memorandum, so the government was deprived of the opportunity to fully investigate the claims or address the conditions she now alleges were deplorable and inhumane. In fact, the letters of support attached to her sentencing memorandum paint a very different picture: according to her fellow inmates, the defendant regularly attends mass and bible study, has a good sense of humor, and shares her "delicious desserts" with her fellow innates. See Def. Sent. Mem., Letters from Gabriela Rubio and Sherry Li. Her generalized, unproven allegations about conditions at the MDC should not materially alter the appropriate sentence.

In sum, the defendant engaged in a troubling pattern of fraud, and a sentence of 24 months' incarceration is necessary to account for the seriousness of the defendant's crimes and to deter her from continuing her pattern of fraud.

---

[9]    The defendant appears to reference widespread reporting in February 2025 of maggots in beans that began when the Federal Defenders of New York sent the New York Daily News an undated, unverified photograph, purportedly from the MDC—without first alerting any MDC staff, AUSA, or judge of the alleged problem. By the time the Government and BOP learned of the story, the meal at issue was days past. Even so, MDC was able to determine that beans had not even been on the menu the day the photo was supposedly taken. Now, more than a year later, counsel continues to cite that unsubstantiated article as a basis to reduce the defendant's sentence.

VI.    <u>Conclusion</u>

      For the foregoing reasons, the government respectfully requests that the Court impose a sentence of 24 months' imprisonment.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:    /s/ Russell Noble
        Russell Noble
        Assistant U.S. Attorney
        (718) 254-6178


cc:    Clerk of the Court (DG) (By ECF and Email)
       Thomas Dunn, Esq. (By ECF and Email)
       Lauren Di Chiara, Esq. (By ECF and Email)
       Jeremy Toner, United States Probation Officer (By Email)